THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:
September 22, 2015

Mailed:
April 27, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Mini Melts, Inc.*
*v.*
*Reckitt Benckiser LLC*

_____

Opposition No. 91173963
to Application Serial Nos. 78814088 and 78814106

_____

Robert G. Oake, Jr. of Oake Law Office for Mini Melts, Inc.

Debra Deardourff Faulk and Stefan V. Stein of Gray Robinson for Reckitt Benckiser.

_____

Before Quinn, Adlin and Goodman, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Reckitt Benckiser LLC ("Applicant") filed applications to register the marks

MINIMELTS and MINI-MELTS (both in standard characters) for "pharmaceutical

preparations for use as an expectorant" in International Class 5.[1]

Mini Melts, Inc. ("Opposer") opposed registration under Section 2(d) of the

Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's marks, when

---

[1] Application Serial Nos. 78814088 and 78814106, respectively, filed on February 14, 2006 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), alleging a bona fide intention to use each of the marks in commerce.

used in connection with Applicant's goods, so resemble Opposer's previously-used and registered mark MINI MELTS (in standard characters, "MINI" disclaimed) for "ice cream" in International Class 30[2] as to be likely to cause confusion.[3] By way of an amended pleading accepted by the Board on July 20, 2012, Opposer also alleged that Applicant's marks are merely descriptive under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), and without acquired distinctiveness under Section 2(f), 15 U.S.C. § 1052(f).

Applicant, in its answers, denied the salient allegations of likelihood of confusion and mere descriptiveness. In denying the allegations of mere descriptiveness, Applicant also affirmatively alleged that its marks have acquired distinctiveness under Section 2(f).

## THE RECORD

The record is extensive, consisting primarily of the testimony and exhibits from a prior civil proceeding between the parties.[4] More specifically, the record includes the pleadings; the files of the involved applications; trial testimony, with related exhibits, taken by each party; official records, Applicant's responses to Opposer's discovery requests, printed publications, Internet websites, and a wide range of documents, all introduced by Opposer's 61 notices of reliance; and Internet websites,

---

[2] Registration No. 4154231, issued June 5, 2012.

[3] So as to be clear, Opposer did not assert a claim of dilution under Section 43(c) of the Trademark Act, 15 U.S.C. 1125(c). Indeed, as noted *infra*, Opposer does not contend that its mark has acquired sufficient fame even for the likelihood of confusion analysis.

[4] Each party filed multiple motions for leave to use testimony and evidence introduced in a civil action (*see* discussion, *infra*). Each motion indicates that the adverse party does not oppose the motion. Accordingly, each of the motions is granted. Trademark Rules 2.122(f) and 2.127(a).

Opposer's and Applicant's responses to discovery requests, and official records, all made of record in Applicant's several notices of reliance.[5]

The parties filed briefs, and each party was represented by counsel at an oral hearing held before this panel.

**BACKGROUND**

By way of background, the notice of opposition was filed over nine years ago, and the parties are not strangers. During the pendency of this opposition, proceedings were suspended for approximately 4.5 years, pending the final outcome of a civil action between Opposer and Applicant, which involved, in relevant part, a jury trial on trademark infringement and unfair competition, and a bench trial on dilution by tarnishment, and appeals (including an unsuccessful writ of certiorari to the United States Supreme Court) (the "Federal Case"). Applicant prevailed in the Federal Case, including in all appeals.

More specifically, in a Final Judgment dated December 22, 2009, the District Court, *inter alia*, entered judgment in Applicant's favor on each of Opposer's claims of trademark infringement and unfair competition, and on Opposer's claim for

---

[5] Opposer details at length the record in its brief; Applicant does not dispute the accuracy of this description. (72 TTABVUE 10-13). Many of the items introduced by notice of reliance are not proper subject matter for introduction in such fashion. However, the notices of reliance include corresponding admissions regarding the authenticity of the items. *See Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1103-04 (TTAB 2007) (because respondent produced documents in responding to petitioner's interrogatories and admitted in responses to requests for admissions that the documents it produced were true and correct copies of authentic documents, documents are admissible by way of a notice of reliance). *See generally* TBMP § 704.11 (2015). In view thereof, and inasmuch as neither party has raised any objections, we have considered all of the testimony and evidence submitted by the parties. *See, e.g., Jeanne-Marc, Inc. v. Cluett, Peabody & Co.*, 221 USPQ 58, 59 n.4 (TTAB 1984) (improper subject of notice of reliance but no objection raised).

trademark dilution under Texas law. *Mini Melts, Inc. v. Reckitt Benckiser, Inc.*, Case No. 4:07-cv-271 (E.D. Tex. Dec. 22, 2009) (2009 WL 9073081) (the "District Court Decision"). In a decision dated March 11, 2011 (No. 10-40048), the U.S. Court of Appeals for the Fifth Circuit affirmed the District Court decision. *Mini Melts, Inc. v. Reckitt Benckiser, Inc.*, 418 F.App'x. 271 (5th Cir. 2011) (the "Appeals Court Decision"). On October 3, 2011, the U.S. Supreme Court denied Opposer's writ for certiorari (No. 11-47).

Before proceeding to the merits of this opposition, and because the present record includes a significant amount of testimony and evidence introduced in the Federal Case (*see* Trademark Rule 2.122(f)), it behooves us to review the claims, defenses and ultimate resolution of the Federal Case, which closely tracked the issues involved herein. (22 TTABVUE 6-46).[6] We turn first to the Board's order dated July 20, 2012, addressing motions for judgment on the pleadings based on the Federal Case. (33 TTABVUE).[7] Because the parties submitted materials outside the pleadings, the Board treated the motions as cross-motions for summary judgment. Applicant filed its motion on the grounds of claim preclusion or issue preclusion; and Opposer filed its motion on the ground of judicial estoppel, that is, that Applicant is judicially

---

[6] Citations to the record in this opinion are to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which cannot be viewed on TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[7] Neither party has asked us at final hearing to revisit the earlier rulings; we recount the Board's rulings merely to provide background.

estopped from obtaining registrations of the marks MINIMELTS and MINI-MELTS *per se*, without being accompanied by Applicant's mark MUCINEX.

In ruling on Applicant's motion, the Board determined that neither claim preclusion nor issue preclusion was applicable. As to claim preclusion, the claim for trademark infringement was based on different transactional facts than those herein. Indeed, Applicant defended against the claims in the Federal Case by arguing, as reflected by the trial transcript, that it uses MUCINEX as its trademark and MINI-MELTS as a "descriptor to describe the form in which the Mucinex takes for children…." The Court's findings of fact were based on Applicant's use of CHILDREN'S MUCINEX MINI-MELTS, whereas Applicant's involved marks in this proceeding are MINIMELTS and MINI-MELTS. With respect to issue preclusion, because Applicant's marks in the respective proceedings are not identical, the doctrine does not apply. Accordingly, Applicant's motion was denied.

As for Opposer's motion, the Board ruled that the Federal Case did not result in precluding Applicant from using or registering MINIMELTS or MINI-MELTS. In denying Opposer's motion, the Board stated that the Federal Case "was based on different facts from the present opposition, and the ground of judicial estoppel is therefore inapplicable to the extent that Opposer seeks to preclude Applicant from obtaining registrations for its involved marks that do not include the term MUCINEX as a prefix to those marks." (33 TTABVUE 12-13).

In view of the above, the Federal Case does not preclude our independent determination of the merits of this proceeding.

We also highlight, for purposes of background, some of the parties' statements regarding the genesis of this proceeding. Opposer, in its brief, states:

> This case presents the only known situation in the United States where a drug company named a "use only as directed" medicine the same name as the federally registered trademark of a popular children's novelty treat. There is a good reason that it never has been done before. It is neither safe nor smart.
> (72 TTABVUE 45).
>
> \*\*\*\*\*
>
> Given [Applicant's] clear knowledge of the dangers associated with marketing its medicine with names that sound like candy, it is irresponsible and dangerous that [Applicant] now is marketing its medicine with a name that … is associated with a novelty ice cream … The only reason a reported decision likely does not exist on these types of facts is that no pharmaceutical company has attempted this dangerous course before.
> (72 TTABVUE 49).
>
> \*\*\*\*\*
>
> The relevancy of safety issues to the facts of this Opposition is apparent. Indeed, a foreseeable situation is when a child who associates the name "Mini Melts" with ice cream sees the name "Mini Melts" on a drug box at home and assumes the drug is also a treat that can be eaten. Children are active and curious, and lacking experience and judgment, they are vulnerable to all types of dangers in the environment. They must be protected. It is confusing and dangerous that [Applicant] has named a use only [as] directed medicine with potentially serious side effects the same name as a popular children's novelty treat. To [Opposer's] knowledge, no other company has ever done that before. [Opposer] does not believe it should be allowed to happen for the first time in this case.
> (72 TTABVUE 51).

Applicant responded with the following:

> Opposer once again attempts to turn this trademark case into a products liability case by interjecting irrelevant safety considerations … Opposer impermissibly seeks to transform a case about branding into a case about the

> safety of [Applicant's] MINI MELTS pharmaceutical preparation … Opposer is simply a small, sporting event kiosk/vending machine operation selling cryogenically-cooled ice cream that is attempting to assert omnibus trademark rights against [Applicant's] pharmaceutical preparations.
> (73 TTABVUE 35, 36-37, 44).

Of particular note is that the District Court declined to include in the trademark-infringement jury instructions any reference to the danger of product confusion or safety considerations. And on appeal, the Fifth Circuit found no error in this regard: "The district court did not abuse its discretion by refusing the instruction because, *inter alia*, on this record, safety considerations and danger to public health were not within the factors to be considered in deciding likelihood of confusion *vel non*."[8]

**STANDING**

To establish standing, an opposer must show that it is not an intermeddler. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999). Specifically, Opposer must prove that it has a "real interest" in this opposition proceeding, that is, a "direct and personal stake," and a "reasonable basis" for its belief in damage. *Id.* at 1026-27. Opposer has established its standing by virtue of its registration and use of the mark MINI MELTS for ice cream. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 50 USPQ2d at 1026-27; *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

---

[8] According to Opposer: "Unlike the Third Circuit, Second Circuit and the Trademark Trial and Appeal Board, the Fifth Circuit has not yet recognized the relevancy of safety considerations in the likelihood of confusion analysis (no case has yet addressed it), and the trial court did not permit a jury instruction on the issue of safety considerations." (72 TTABVUE 25).

Because Opposer established standing for its likelihood of confusion claim, it has standing to assert any other ground for opposition that may negate Applicant's right to obtain registration, including that Applicant's mark is merely descriptive. *See Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987); *Lipton Indus., Inc. v. Ralston Purina Co.*, 213 USPQ at 190; *Marmark Ltd. v. Nutrexpa S.A.*, 12 USPQ2d 1843, 1844 (TTAB 1989).

**PRIORITY NOT AT ISSUE**

In view of Opposer's ownership of a valid and subsisting registration for its mark MINI MELTS, priority is not at issue with respect to the goods identified in Opposer's pleaded registration, "ice cream." *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). In any event, the record establishes Opposer's use of its mark on ice cream prior to Applicant's filing date.

**LIKELIHOOD OF CONFUSION**

We now turn to the merits of the notice of opposition. Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence. In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

**THE MARKS**

With respect to the first *du Pont* factor involving the similarity between the parties' marks, we must compare Opposer's mark MINI MELTS (in standard characters) to Applicant's marks MINIMELTS and MINI-MELTS (both in standard characters) as to appearance, sound, connotation and commercial impression. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005), quoting *In re E. I. du Pont de Nemours & Co.*, 177 USPQ at 567. "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (citation omitted). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Johann Maria Farina Gegenuber Dem Julichs-Platz v. Chesebrough-Pond, Inc.*, 470 F.2d 1385, 176 USPQ 199, 200 (CCPA 1972); *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1740 (TTAB 2014); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

As to appearance, Opposer's mark MINI MELTS is essentially identical to each of Applicant's marks MINIMELTS and MINI-MELTS. The absence of a space in Applicant's mark MINIMELTS does not meaningfully distinguish it from Opposer's mark. *See In re Omaha Nat. Corp.*, 819 F.2d 1117, 2 USPQ2d 1859 (Fed. Cir. 1987) (affirming the Board's finding that FirsTier is the phonetic equivalent of "first tier"); *Armstrong Mfg. Co. v. Ridge Tool Co.*, 132 F.2d 158, 56 USPQ 165, 166 (CCPA 1942)

9

("Vistand" is the equivalent of "vise stand"); *Seaguard Corp. v. Seaward Int'l, Inc.*, 223 USPQ 48, 51 (TTAB 1984) (SEAGUARD and SEA GUARD "are, in contemplation of law, identical"). Likewise, the hyphen in Applicant's mark MINI-MELTS does not distinguish it from Opposer's mark. *See Mag Instrument Inc. v. Brinkman Corp.*, 96 USPQ2d 1701, 1712 (TTAB 2010); *Charrette Corp. v. Bowater Commc'n Papers Inc.*, 13 USPQ2d 2040, 2042 (TTAB 1989); *see also Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 224 USPQ 119, 121 (6th Cir. 1984) ("The use of hyphens distinguishes between the two marks only on a visual level since this difference is absent when the words are spoken."); *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 188 USPQ 623 (7th Cir. 1976) ("Courts have often held that small changes in words, such as adding or deleting a hyphen, are insufficient to distinguish marks.") (citations omitted).

In terms of sound, the marks are identical. Further, the marks convey identical meanings, namely, something small in size that melts. (*See* discussion regarding descriptiveness, *infra*).[9] Given the similarities between the marks, they engender

---

[9] The pretrial order in the Federal Case includes the following concessions made by Applicant: "[Applicant] uses the mark Mucinex in connection with a descriptive mark, Mini Melts, that is descriptive" (57 TTABVUE 6); and "Mini Melts accurately and fairly describes the nature of the miniature granules of the cough and cold medicine that immediately begin to melt in a person's mouth when taken." (57 TTABVUE 7).

overall commercial impressions that are virtually identical.

Applicant argues that there is "absolutely no similarity" between the marks. (72 TTABVUE 16). This argument is misplaced at best as the factual foundation thereof is irrelevant to our analysis, namely, that Applicant's mark is used with its house mark MUCINEX, and that the parties use their marks with other distinguishing matter. Contrary to the gist of Applicant's argument, the likelihood of confusion issue before us involves the marks as shown in Opposer's registration certificate and Applicant's applications—Opposer's standard character mark MINI MELTS and Applicant's standard character marks MINIMELTS and MINI-MELTS; neither a design feature nor a house mark constitutes part of the marks sought to be registered. Accordingly, this argument is unavailing. *See, e.g., Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1847 ("registrations with typed drawings are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce"); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993) (disregarding the applicant's argument that its use of the house mark SHELL with the mark at issue would weigh against confusion); *Kimberly-Clark Corp. v. H. Douglas Enters., Ltd.*, 774 F.2d 1144, 227 USPQ 541, 543 (Fed. Cir. 1985) ("It is settled, however, that a distinction in trade dress cannot weigh against likelihood of confusion with respect to the registration of a simple word mark like DOUGIES. The reason is that trade dress might well be changed at any time; only the word mark

11

itself is to be registered.")[10] *See also Chesebrough-Pond's Inc. v. Soulful Days, Inc.*, 228 USPQ 954, 956 (TTAB 1985).

The virtual identity between Opposer's mark and each of Applicant's marks weighs heavily in favor of a finding of likelihood of confusion.

**THE GOODS**

We next turn to consider the second *du Pont* factor regarding the similarity/dissimilarity between the goods. We make our determination regarding the similarities between the parties' goods, channels of trade and classes of purchasers based on the goods as they are identified in the applications and registration, respectively. *Octocom Sys. Inc. v. Houston Computers Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). In considering this *du Pont* factor, we note that where virtually identical marks are involved, as is the case here, the degree of similarity between the goods that is required to support a finding of likelihood of confusion declines. *In re Shell Oil Co.*, 26 USPQ2d at 1688-89, citing *Philip Morris Inc. v. K2 Corp.*, 555 F.2d 815, 194 USPQ 81 (CCPA 1977) ("even when the goods or services are not competitive or intrinsically related, the use of identical marks can lead to the assumption that there is a common source"); *Time Warner*

---

[10] It is noted that prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) ("until 2003, 'standard character' marks formerly were known as 'typed' marks, but the preferred nomenclature was changed in 2003 to conform to the Madrid Protocol … we do not see anything in the 2003 amendments that substantively alters our interpretation of the scope of such marks"); TMEP § 807.03(i) (2015).

*Entm't Co. v. Jones*, 65 USPQ2d 1650 (TTAB 2002); *In re Opus One Inc.*, 60 USPQ2d 1812 (TTAB 2001). It is only necessary that there be a "viable relationship between the goods" to support a finding of likelihood of confusion. *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1439 (TTAB 2012). Of particular importance here is that the issue is not whether purchasers would confuse the goods (ice cream and pharmaceutical preparations), but rather whether there is a likelihood of confusion as to the source of these goods. *Id.*; *see also Hydra Mac, Inc. v. Mack Trucks, Inc.*, 507 F.2d 1399, 184 USPQ 351 (CCPA 1975) ("the confusion found to be likely is not as to the products but as to their source") (citation omitted).

Applicant's "pharmaceutical preparations for use as an expectorant" are sold in granular form comprising miniature granules that are coated with a flavoring that melts in the user's mouth:

> New Children's Mucinex Mini-Melts … designed specifically with kids in mind – in fun-tasting flavors and easy-to-take forms. They're great-tasting and fun-to-take. You just pour a packet of quick-melting Mini-Melts on your child's tongue, and they're easily swallowed. Mini-Melts come in kid-friendly Bubble Gum and Grape flavors.
> (53 TTABVUE 9-10).

To state the obvious, Opposer's "ice cream" and these pharmaceutical preparations are very different. Although both products are ingestible and intended for consumption by children, the similarities end there. Not surprisingly, the record is devoid of any evidence that a single entity produces both ice cream and a pharmaceutical, let alone under the same mark. Accordingly, the proofs fail to show even a "viable relationship" between the goods. Opposer's allegation that Applicant's

"easy-to-take forms" are similar to the form of Opposer's ice cream may be relevant to whether the goods are similar in nature; however, this statement is not relevant to whether there is a sufficient commercial relatedness between the *goods*, (as opposed to their *form*), to lead to likely confusion as to source. Moreover, this allegation ignores the fact that Opposer's identification of goods simply reads "ice cream," which is presumed to encompass all types of ice cream in all forms. *See, e.g.*, *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 107 USPQ2d 1167, 1173 (Fed. Cir. 2013). The significant differences in the nature of the goods weigh heavily against a finding of likelihood of confusion.

**TRADE CHANNELS**

Opposer's cryogenically frozen ice cream requires storage in specific equipment utilizing liquid nitrogen. (56 TTABVUE 20-21; 69 TTABVUE 95). This specialized equipment must be capable of maintaining extremely low cryogenic temperatures of about -40°F, which is much colder than conventional refrigerator freezers. Thus, distribution and sale of the ice cream involves the use of specialized equipment. Currently, the product is sold through kiosks, vending machines and freezer carts at venues such as shopping malls (which frequently contain drug stores like CVS, Rite-Aid or Walgreens), sporting events, concerts, theme parks and fairs. Opposer's actual product is not sold at drug stores, grocery stores, or convenience stores. (69 TTABVUE 95). By contrast, Applicant's goods are sold in drug stores, grocery stores and the like.

Thus, the evidence shows that the goods, in actuality, travel in different trade channels. However, absent any explicit restriction in Opposer's registration or Applicant's application (as is the case herein), we must presume that Opposer's "ice cream" includes ice cream of all types, including those types that could travel in many of the same channels of trade as retail, over-the-counter pharmaceutical preparations. *Coach Servs. Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1722; *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (citing *Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)). These presumed trade channels would include grocery stores with pharmaceutical aisles, drug stores selling frozen confections, and mass merchandisers such as Walmart, Target and Costco that sell both pharmaceuticals and ice cream. In saying this, however, we recognize that the mere fact that disparate products are sold in the same retail outlets does not, standing alone, establish that the goods are related for purposes of determining likelihood of confusion. In this connection, we are mindful of the perspective offered by our primary reviewing court:

> A wide variety of products, not only from different manufacturers within an industry but also from diverse industries, have been brought together in the modern supermarket for the convenience of the customer. The mere existence of such an environment should not foreclose further inquiry into the likelihood of confusion arising from the use of similar marks on *any* goods so displayed. (emphasis in original).

*Federated Foods, Inc. v. Fort Howard Paper Co.*, 192 USPQ at 29. *See also Recot, Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899-1900 (Fed. Cir. 2000) (absent some evidence that the products are sold in close proximity to one another, the fact that

the involved products are sold in supermarkets did not weigh in favor of confusion being likely); *Morgan Creek Prods. Inc. v. Foria Int'l Inc.*, 91 USPQ2d 1134, 1142 (TTAB 2009) ("It has long been held that the mere fact that two different items can be found in a supermarket, department store, drugstore or mass merchandiser store is not a sufficient basis for a finding that the goods are related.").

On balance, we find that, although the goods are distinctly different, no matter what type of "ice cream" we consider to be encompassed by the identification in Opposer's registration, the similarity in trade channels (at least insofar as we are constrained to consider them) weighs somewhat in Opposer's favor.

**CONDITIONS OF SALE and CLASSES OF PURCHASERS**

There is little evidence from the parties on these issues, but certainly common sense facts that are not subject to reasonable dispute are sufficient in this case. With respect to purchasers, although Opposer asserts that it markets its ice cream to young children, it cannot reasonably be disputed that adult parents at times play a role in the purchase of Opposer's ice cream. Insofar as Applicant's pharmaceutical preparations are concerned, it unquestionably is the case that parents purchase these goods for consumption by their sick children. It also is beyond dispute, however, that children can influence their parents in making purchases of pharmaceutical preparations when the medicine comes in different flavors (as is the case with Applicant's medicine). Nevertheless, the parents make the ultimate purchasing decision, with the child possibly influencing which flavor of the needed medicine the parents buy.

Accordingly, to the extent that both products may be purchased by parents, we find there is an overlap in customers. So, to that extent, the commonality in purchasers weighs in favor of a finding of likelihood of confusion.

As to conditions of sale, the parties agree that Opposer's ice cream is relatively inexpensive. Opposer's ice cream is a product that typically would be purchased on impulse upon seeing one of Opposer's kiosks, carts or vending machines at a shopping mall or sporting event.

The parties also agree that Applicant's pharmaceuticals are sold over the counter and are relatively inexpensive. Given the nature of these pharmaceutical preparations, however, we find it reasonable to conclude that purchasers would not buy the goods on impulse. Rather, parents of a sick child are likely to make an informed decision about which product to buy to best address their child's illness. That is to say, parents will be reasonably careful when they review ingredients, potential side effects and specific purposes of the medication before buying it and giving it to their child, and may consult with a pharmacist or even a doctor. *Smithkline Beckman Corp. v. Proctor & Gamble Co.*, 591 F. Supp. 1229, 223 USPQ 1230 (N.D.N.Y. 1984), *aff'd*, 755 F.2d 914 (2d Cir. 1985) ("A reasonably prudent purchaser would be somewhat more careful when purchasing over-the-counter medications than when purchasing other household or grocery items. Most consumers are aware that medications can be dangerous if taken incorrectly and would, therefore, be reasonably careful when purchasing them." No infringement

17

found.). Thus, we find that the conditions of sale weigh against a finding of likelihood of confusion.

Opposer equates this case to those between parties that are both selling medicinal products, arguing that greater protection of Opposer's mark is required than in the ordinary non-medicine case because confusion of source or product may harm purchasers. Thus, Opposer argues that a lesser quantum of proof of confusing similarity should be required here. *See, e.g., Alfacell Corp. v. Anticancer Inc.*, 71 USPQ2d 1301 (TTAB 2004).

We disagree that the case law Opposer cites is applicable to this case, most especially because of the disparate nature of the goods. Opposer cites only cases involving two pharmaceutical products, whereas here we are presented with, on the one hand, a frozen confection and, on the other, a pharmaceutical. In other words, there is no possibility that a consumer will mistake one potentially dangerous product for another.[11] Rather, because there is only one potentially dangerous product at issue here, and the goods are so different, such mistakes necessarily will be avoided.[12] Just to be clear, in saying this, we reiterate that the issue herein is not whether purchasers would confuse the goods (ice cream and pharmaceutical preparations), but rather whether there is a likelihood of confusion as to the source of these distinctly different goods.

---

[11] While repeated over-indulgence in a frozen confection, just like other products with sweeteners, might contribute to obesity or other health issues, we do not consider Opposer's ice cream to be a potentially dangerous product.

[12] Applicant points out that "despite over 779.3 million doses sold, there has been no evidence of a child ingesting or eating guaifenesin [Applicant's product] thinking it was ice cream." (73 TTABVUE 38).

**NUMBER and NATURE OF THIRD-PARTY MARKS/
STRENGTH OF OPPOSER'S MARK**

The sixth *du Pont* factor requires us to consider evidence pertaining to the number and nature of similar marks in use on similar goods. "The purpose of a defendant introducing third-party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different such marks on the bases of minute distinctions.'" *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1691. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1135-36 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674-76 (Fed. Cir. 2015) ("More broadly, evidence of third-party use bears on the strength or weakness of an opposer's mark.").

It is Opposer's position, however, that its mark is strong:

> [Opposer] does not contend that the mark MINI MELTS meets the high standard of fame for this Board's likelihood of confusion determination. However, [Opposer] does contend that the MINI MELTS mark has achieved a significant degree of recognition and strength and that the mark is therefore entitled to a broader scope of protection than might be accorded a mark with less recognition.
> (72 TTABVUE 36)

Opposer relies upon the following evidence in support of its claim: sales in at least 35 states, including at venues such as Texas Stadium, the Bronx Zoo (NY), and Dollywood theme park in Tennessee, as well as at several large shopping malls; sales through vending machines, including 160 machines in Wal-Mart stores; sales

19

revenue for the period 2011-2012 totaling just over $6 million; and Opposer's advertisements in trade and franchise magazines and through the Internet. Opposer also points to a survey (*see* discussion, *infra*) showing that 42% of those interviewed had heard of MINI MELTS ice cream.

Although Opposer has enjoyed some success with its product, the totality of the evidence fails to establish that its mark is commercially strong, the same conclusion reached in the Federal Case. As discussed below, we do not find that the survey supports Opposer's position; Applicant's expert explained that the survey was designed to reach the target geographic areas of Opposer's customer's base. Thus, while 42% of the respondents in those areas had heard of Opposer's brand, we are unwilling to extrapolate, as done by Opposer, the survey results to the consuming public at large.

In countering Opposer's claim of strength, Applicant details various facts in concluding that Opposer's mark is weak:

> [F]our examining attorneys that reviewed Opposer's MINI MELTS trademark applications, including the most recent registration (Reg. No. 4,154,231), a professional trademark search service, a jury, the Fifth Circuit Court of Appeals and the United States Supreme Court have concluded that Opposer's mark MINI MELTS for ice cream is weak, worthy of limited protection and that Opposer would be required to coexist with many MINI MELTS trademarks for similar, and certainly dissimilar goods and services.
> (73 TTABVUE 32).

Applicant also points to a Thomson Compumark search report that Applicant solicited when deciding to adopt its current marks. In the report, Opposer's mark was

categorized in a group of marks as being the least likely of all of the referenced third-party marks to cause confusion with Applicant's marks.

Applicant also points to the facts that when Opposer filed its application to register MINI MELTS, two third-party prior-pending applications to register the same mark, one for dough and the other for bread, were not cited as potential bars to registration under Section 2(d).[13] (Findings of Fact No. 11 in the Federal Case, 69 TTABVUE 96). Specifically, Applicant highlights these two applications to register the same mark: "The Pillsbury Company's trademark intent-to-use application for Mini Melts for dough filled with meat, vegetables or cheese"; and "The Stouffer Corporation's trademark intent-to-use application for "'pre-cooked, ready-to-eat frozen bread having a meat, cheese and/or vegetable filling.'" In addition, Applicant notes that Opposer's registration was not cited against Applicant's applications when they were examined by the Office.

Also of record are certain third-party uses and registrations of similar marks.[14] Applicant submitted two registrations, Reg. Nos. 2945517 (MINIS and design) and 3288114 (M&M's MINIS and design) owned by the same entity for candy.

Applicant further points to Findings of Fact No. 10 by the District Court in the dilution portion of the Federal Case:

> The mark MINI MELTS has been used by several other parties. For example, the evidence demonstrated that the term MINI MELTS was used the following ways: (1) Tyson's Spicy Frisco Chicken Mini Melt; (2) Rachel Ray's Tuna Mini Melts with Rosemary; (3) Gertrude Hawk's

---

[13] The applications subsequently were abandoned.
[14] The examples include use of MINIS in connection with candy. We have accorded less probative value to these uses in view of the differences between MINIS and MINI MELTS.

mini melt technology; (4) La Dolce Vita, a Mini Melt Cake with Raspberry Mousse and Chocolate Dipped Strawberries; (5) Glue Machinery Corporation's Mini Melts Fill Tank; (6) Peach Mini Melt Pink Iced Cake; (7) Mini Melts, the candles; (8) Tealight Mini Melts warmers; (9) Electric Mini Melts Warmers; and (10) Mini Melt, the comic bookstore.
(69 TTABVUE 95-96)

Findings of Fact No. 12 states: "The term 'mini melts,' or a similar version, is used in many different ways in the marketplace, and therefore does not have a strong standing in the marketplace when used to identify [Opposer's] ice cream." (69 TTABVUE 96).

In the Conclusions of Law No. 6, the Court found that Opposer's mark "is not a distinctive mark under the Texas anti-dilution statute, Tex. Bus. & Comm. Code § 16.29." (69 TTABVUE 98).

In addition, Applicant points to third-party uses it discovered after the conclusion of the civil trial in 2009. They are MINI MELT AWAY MINTS (Hickory Farms) and MINI MELTS (Hershey), both for candy.

Applicant's evidence, as observed in the Federal Case, shows that third parties have been attracted to adopting the same or similar mark and, in several instances, for use in connection with food products that are far closer in nature to Opposer's ice cream (*e.g.*, cake and candy) than are Applicant's pharmaceuticals. Even where the record lacks proof of the extent of third-party use, this evidence still may show that a term carries a highly suggestive connotation in the industry and, therefore, may be considered weak. Again, in the words of the District Court, Opposer's mark "does not have a strong standing in the marketplace when used to identify [Opposer's] ice

22

cream." (69 TTABVUE 96). *See also Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 116 USPQ2d at 1136; *Juice Generation, Inc. v. GS Enters. LLC*, 115 USPQ2d at 1675.

In any event, even if we found Opposer's mark to be strong for ice cream, the evidence does not establish any corresponding strength in industries outside of ice cream, and no evidence suggests that any strength would carry over to disparate goods (such as pharmaceutical preparations) that are "specifically different and noncompetitive." *See Elec. Design & Sales Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 21 USPQ2d 1388, 1393 (Fed. Cir. 1992); *Fruit of the Loom, Inc. v. Fruit of the Earth, Inc.*, 3 USPQ2d 1531, 1533-34 (TTAB 1987).

Given the evidence regarding third-party use and registrations, consumers are likely to be accustomed to encountering the term "mini melt(s)" in relation to food products. This fact tends to show that Opposer's mark is relatively weak, and we have considered this factor in our likelihood of confusion analysis. Accordingly, the weakness of Opposer's mark weighs against a finding of likelihood of confusion.

**ACTUAL CONFUSION/SURVEY EVIDENCE**

The parties are unaware of any instances of actual confusion, and Applicant highlights that the marks have been in contemporaneous use for eight years without actual confusion.[15] However, Opposer's president, Tom Mosey, testified that members of his sales and distribution network, who are familiar with Applicant's mark and goods sold thereunder, asked him if Opposer had agreed to license, sponsor or endorse

---

[15] Although the involved applications technically remain based on Applicant's allegation of its intent to use the marks, use of the marks began years ago.

Applicant's product, or whether Opposer and Applicant were affiliated companies. (56 TTABVUE 31-33). These purported inquiries of individuals affiliated with Opposer are hearsay. Even ignoring that this evidence consists of hearsay, it is entitled to little weight. Without direct testimony from these individuals, there is insufficient information to ascertain what they were thinking, or what caused the purported confusion. *See Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 204 USPQ 697, 701 (CCPA 1980) (court held statements offered to prove the state of mind of a third party concerning confusion between two marks is hearsay, observing: "Actual confusion is entitled to great weight but only if properly proven … Such is not the case here."); *see also Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1334 (TTAB 1992) (inquiries as to corporate affiliations is not evidence of confusion because, without more, they "indicate that these persons were aware that [the companies at issue] were two different entities"); *Elec. Water Conditioners, Inc. v. Turbomag Corp.*, 221 USPQ 162, 164 (TTAB 1984) ("That questions have been raised as to the relationship between firms is not evidence of actual confusion of their trademarks.") (citation omitted).

Opposer relies upon a survey commissioned by Applicant (as designed by James T. Berger) and used in the Federal Case. (53 TTABVUE 14-24). Applicant conducted such survey to determine the likelihood of confusion (in fact, reverse confusion) between the parties' marks involved in the Federal Case, MINI MELTS versus CHILDREN'S MUCINEX MINI-MELTS, for their respective products. At first blush, Opposer's position is unusual in that it is relying on a survey conducted by Applicant,

and which was only relied on by, and which only benefited Applicant in the Federal Case. In Opposer's view, however, the survey leads to a conclusion, not of a confusion rate of 7%-8.5% as asserted by Applicant's expert, but rather a rate of 31.5%; moreover, Opposer argues that the survey responses show not mere likelihood of confusion (at whatever level), but actual confusion because the respondents would not have answered them the way they did unless they were actually confused.

Applicant hired Mr. Berger as a marketing expert who, after reviewing the pleadings, designed a likelihood of confusion/dilution survey. As indicated in his survey report, Mr. Berger has "testified as an expert in strategic marketing, marketing communications and intellectual property surveys with respect to brands and trademarks," and over the last ten years has been "retained as an expert in three dozen or more lawsuits." Mr. Berger also has authored articles on intellectual property surveys. (53 TTABVUE 17-18). Mr. Berger summarized his survey:

> This report focuses on a research study I conducted to determine if members of [Opposer's] target market would be able to differentiate between the plaintiff's product and the defendant's product in terms of both function and source, and to determine if those surveyed believe the plaintiff's product (MINIMELTS® THE ICE CREAM DREAM) and defendant's products (Junior Strength MUCINEX® EXPECTORANT·GUAIFENESIAN [sic] mini-melts™) were put out by the same company, owned by the same company, sponsored by the same company, affiliated with each other or are associated with each other.
> (53 TTABVUE 15)

The survey consisted of a double-blind mall intercept survey in which 50 individuals in each of four geographically dispersed venues were interviewed and shown high-quality color photographs of both the plaintiff's and defendant's products.

25

The survey results show that 7%-8.5% of the respondents responded "yes" to at least one of four questions regarding "source": (i) whether the two products were put out by the same company; (ii) whether the two products were owned by the same company; (iii) whether the two products were sponsored by the same company; or (iv) whether the two products were affiliated or associated with each other. Opposer, in arguing that the survey results actually support its likelihood of confusion claim, adds up the separate response rates to arrive at its conclusion that the survey shows a likelihood of confusion rate of 31.5%. Furthermore, under Opposer's theory, even one "yes" answer of any individual respondent is sufficient to establish not merely likelihood of confusion but actual confusion; and a respondent likely would have believed it to be inappropriate to answer "yes" to a question if a previous question already had been answered "yes." Opposer argues, by way of example, that if a respondent believed that one company was owned by the other, participants would have found it inappropriate to answer "yes" to the subsequent question of whether one company was affiliated with the other company.[16] (72 TTABVUE 41). It is based on this reasoning that Opposer concluded the "yes" responses to each of the four options should be totaled to determine the extent of confusion.

We are not persuaded by Opposer's argument, but rather find that Applicant's survey and the methodology to calculate the level of likely confusion are credible. We

---

[16] Opposer also asserts that "[a] significant amount of people answered "I don't know," urging that this answer is evidence of likely confusion in the future. Suffice it to say we do not share Opposer's view. *See Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 220 USPQ 386, 391 (7th. Cir. 1983) ("In interpreting the survey, the district court correctly discounted the 'don't knows'…").

agree with the expert opinion of Mr. Berger who designed the survey and studied its results: namely, that any likelihood of confusion is *de minimis*. Opposer neither offered its own survey nor hired its own survey expert. If Opposer wished to challenge the survey results and Mr. Berger's opinion about them (including his calculation to determine the level of confusion), it could have hired its own expert to provide an opinion regarding those results.

Opposer clearly accepts the survey's overall methodology, and the validity of the survey. Indeed, Opposer does not level any criticisms at the survey itself. Accordingly, we see no reason to painstakingly review the survey's methodology, or to address the parties' respective arguments about what the survey shows. Rather, we will proceed directly to Mr. Berger's conclusions in his report:

> INTERPRETATION OF FINDINGS
> The marketplace both recognizes and understands the purposes and/or function of both the Mucinex and the ice cream products. Those surveyed clearly were able to differential [sic] the two products in terms of form and function. Well under 10 percent those [sic] surveyed believed there was no [sic] connection or affiliation between the products in terms of being put out by the same company, owned by the same company, sponsored by the same company, affiliated with each other or associated with each other

27

> OPINIONS
> In my opinion, members of the senior user's [Opposer's] channels of trade can differentiate between the two products and they clearly believe there is no connection between the two products in terms of ownership, sponsorship, affiliation or association. Finally, because there is such obvious knowledge of both products and a recognition that these products are so different in form, function and usage, I believe neither product or trademark is in any way tarnished or blurred by the other product.
> (53 TTABVUE 23).

Simply put, we agree with Applicant's assessment of its survey, which comports with Mr. Berger's conclusions; that is, the survey shows a likelihood of confusion rate of 7%-8.5%. Thus, the survey shows, at worst, a *de minimis* level of confusion as to the source of the parties' respective products. Professor McCarthy states that "[w]hen the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely." J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:189 (4th ed. March 2016). *See Water Pik, Inc. v. Med-Sys. Inc.*, 726 F.3d 1136, 107 USPQ2d 2095, 2105 (10th Cir. 2013) (Likelihood of confusion rate of less than 6.5% found to be "insignificant"); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1248-1249 (10th Cir. 2013) ("We are not persuaded … that surveys showing confusion as low as 7% can by themselves sustain a likelihood of confusion."); *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 220 USPQ at 391 ("The remaining question is whether the district court was correct in holding that a 7.6% confusion finding weighs against infringement. We hold that it was. Kraft has pointed to no case in which a 7.6% figure constituted likelihood of

confusion."); *Wuv's Int'l, Inc. v. Love's Enters., Inc.*, 208 USPQ 736, 756 (D. Colo. 1980) (9% results; no likelihood of confusion proven).

Accordingly, we find that, if anything, the survey supports Applicant's position of no likelihood of confusion.

**OTHER FACTORS**

The thirteenth *du Pont* factor relates to "any other established fact probative of the effect of use." Indeed, each case must be decided on its own specific and, sometimes, unique facts. This final factor accommodates the need for flexibility in assessing each unique set of facts, such as is the case here.

As indicated earlier, Opposer has argued long and hard over the safety concerns it harbors regarding the contemporaneous use of the parties' identical marks on their respective products. (72 TTABVUE 45-51). Opposer describes the danger as follows:

> The danger is created … because the two products are (i) consumable products that (ii) have identical or similar names, but (iii) dangerously different purposes and results, and (iv) it is foreseeable that both products can be in the same environment. The same danger would be created between two pharmaceuticals, or a pharmaceutical and a home poison (e.g., rat poison), or a food product and a home poison, or a pharmaceutical and a food product such as Mini-Melts drug and Mini Melts ice cream.
> (72 TTABVUE 49).

Mr. Mosey testified that safety is a concern because a child could get access to Applicant's medicine and think, because of the identity in trademarks, that it is one of Opposer's ice cream products or that they could take as much of it as they wanted, thereby causing harm to their well-being. (56 TTABVUE 34). According to Opposer, it is not arguing that Applicant's Mini-Melts medicine should be taken off the market

29

because it is too dangerous; rather, Opposer is arguing that it creates a danger to the public to give a use-only-as-directed medicine with potentially dangerous side effects the same name as a popular children's novelty ice cream treat.

To repeat the long-settled legal maxim, the test herein is not whether the ice cream and pharmaceutical preparations will be confused, but rather whether there is likely to be confusion as to the source of these goods. *E.g.*, *L'Oreal S.A. v. Marcon*, 102 USPQ2d at 1439. We recognize that the record includes a qualitative research study on Applicant's product conducted for Applicant, which reveals that some mothers were concerned that Applicant's medicine looked like sugar or that it might taste so good that their children might want to take more than the recommended dose. The record also includes Medwatch reports chronicling instances when Applicant's medicine was taken in an incorrect dose, and the child became ill. (53 TTABVUE 195-216). Opposer points to this evidence in arguing that children are gaining access to Applicant's pharmaceutical product and taking it without adult permission or supervision. However, the mere fact that minors may abuse Applicant's pharmaceutical preparations, or that parents may accidentally give their child too much of the pharmaceutical preparations, would appear to have nothing to do with confusion between the trademarks; in fact, there is no evidence that anyone abuses or misuses Applicant's product as a result of trademark confusion.

Again, although we appreciate Opposer's safety concerns, we agree with Applicant's view that any evidence of misuse of or complaints about Applicant's

pharmaceutical "simply come[s] with the territory," and does not relate to Opposer's claim under Section 2(d) under the circumstances of this case. (73 TTABVUE 36).

Although we have considered Opposer's safety concerns, we are convinced that any problems arising from the abuse or misuse of Applicant's medicine, whether potential or actual, has no demonstrated relationship to the identical trademarks under which Applicant's medicine and Opposer's ice cream are sold.

**CONCLUSION**

We have considered all of the evidence made of record pertaining to the likelihood of confusion issue in this case, as well as all of the arguments related thereto, including any evidence and/or arguments not specifically discussed in this opinion. We see Opposer's likelihood of confusion claim as amounting to only a speculative, theoretical possibility. Notwithstanding the virtual identity between the marks, the obvious and significant differences between ice cream and pharmaceutical preparations persuade us that confusion is unlikely to occur among consumers in the marketplace. Language by our primary reviewing court is helpful:

> We are not concerned with mere theoretical possibilities of confusion, deception, or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trademark laws deal.

*Elec. Design & Sales Inc. v. Elec. Data Sys. Corp.*, 21 USPQ2d at 1391, citing *Witco Chemical Co. v. Whitfield Chem. Co., Inc.,* 418 F.2d 1403, 1405, 164 USPQ 43, 44-45 (CCPA 1969), *aff'g* 153 USPQ 412 (TTAB 1967).

In view of the above, the notice of opposition grounded on likelihood of confusion is dismissed.

**MERE DESCRIPTIVENESS and ACQUIRED DISTINCTIVENESS**

Applicant originally maintained that its applied-for mark is inherently distinctive; its application was published in the Official Gazette without resort to Section 2(f). During the course of this proceeding, and in response to Opposer's claim that Applicant's mark is merely descriptive, Applicant filed, on October 23, 2012, an amendment to claim the benefits of acquired distinctiveness under Section 2(f).[17]

A term is considered to be merely descriptive under Section 2(e)(1) if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods with which it is used. *See In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217 (Fed. Cir. 2012). "A mark need not recite each feature of the relevant goods or services in detail to be descriptive, it need only describe a single feature or attribute." *Id.*, 102 USPQ2d at 1219 (citation and internal quotation omitted); *see also In re H.U.D.D.L.E.*, 216 USPQ 358, 359 (TTAB 1982); *In re MBAssociates*, 180 USPQ 338, 339 (TTAB 1973).

By now seeking registration of its proposed marks MINIMELTS and MINI-MELTS pursuant to Section 2(f), Applicant has conceded that its applied-for marks are, at the least, merely descriptive of its goods, under Section 2(e)(1).[18] *The Cold War*

---

[17] As discussed in the Background section earlier in this opinion, this opposition has been pending for many years and though the involved applications technically remain based on Applicant's allegation of its intent to use the marks, use of the marks began years ago. As discussed *infra*, because of the procedural posture of the applications, though Applicant has asserted acquired distinctiveness in defending this proceeding, it could not amend its intent-to-use applications to assert actual use of the marks in commerce.

[18] Applicant did not claim acquired distinctiveness in the alternative. *Cf. In re Thomas Nelson, Inc.*, 97 USPQ2d 1712, 1713 (TTAB 2011). *See* TMEP § 1202.02(c).

*Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."). *See In re RiseSmart Inc.*, 104 USPQ2d 1931, 1932 (TTAB 2012) ("[W]hen an applicant responds to a refusal based on mere descriptiveness of a mark, or portion of a mark, by claiming acquired distinctiveness, such amendment to seek registration under Section 2(f) of the Trademark Act is considered an admission that the proposed mark is not inherently distinctive."). Indeed, according to Applicant, "the descriptor 'Mini-Melts' is used as a component of this specific product because it aptly and fairly describes the miniature granules that begin melting as soon as they are poured onto the child's tongue." (73 TTABVUE 40; 53 TTABVUE 33; 57 TTABVUE 6-8).

We note, at the outset, that the two involved applications were filed under Section 1(b) as intent-to-use applications. Section 2(f) is limited by its terms to "a mark used by the applicant." A claim of acquired distinctiveness under Section 2(f) is normally not filed in a Section 1(b) application before the applicant files an allegation of use, because a claim of acquired distinctiveness, by definition, requires prior use.[19] *See* TMEP § 1212.09(a). *See also In re Rogers*, 53 USPQ2d 1741, 1744-47 (TTAB 1999). Thus, at this juncture Applicant is unable to claim the benefit of Section 2(f) because it has not yet filed either an amendment to allege use under Section 1(c), 15 U.S.C. §

---

[19] In this regard, Applicant is claiming acquired distinctiveness on the basis of actual use of the mark; this is not a situation where an intent-to-use applicant who has used the mark on related goods may file a claim of acquired distinctiveness under Section 2(f) before filing an allegation of use.

1051(c), or a statement of use under Section 1(d), 15 U.S.C. § 1051(d). *See generally* TMEP §§ 1104-1104.11 (amendment to allege use); TMEP §§ 1109-1109.18 (statement of use). However, in the interests of judicial economy, and given that the parties litigated the issue, we will decide the issue of acquired distinctiveness. As explained below, we find the evidentiary record to be insufficient to establish acquired distinctiveness.[20]

Section 2(e)(1) provides that a mark (or portion thereof) is unregistrable on the Principal Register if, "when used on or in connection with the goods of the applicant [it] is merely descriptive or deceptively misdescriptive of them … ." Pursuant to Section 2(f), matter which is merely descriptive under Section 2(e)(1) may nonetheless be registered on the Principal Register if it "has become distinctive of the applicant's goods in commerce." Thus, the mark may be registered on the Principal Register if the applicant proves that the merely descriptive matter has acquired distinctiveness (also known as "secondary meaning") as used on the applicant's goods and/or services in commerce. *See Coach Servs. Inc. v. Triumph Learning LLC,* 101 USPQ2d at 1728-30.

In an opposition proceeding based on mere descriptiveness, an applicant may assert in defending against the claim that its mark has acquired distinctiveness under Section 2(f). The question of whether the mark has acquired distinctiveness is determined on the basis of the facts existing as of the time registrability is being

---

[20] If Applicant seeks review of this decision and, on review, prevails on its claim of acquired distinctiveness, so that it obtains a Notice of Allowance, Applicant must file a statement of use under Section 1(d) before a Section 2(f) claim of acquired distinctiveness in the present intent-to-use applications will be accepted by the Office.

considered by the Board. *McCormick & Co. v. Summers*, 354 F.2d 668, 148 USPQ 272, 276 (CCPA 1966) (secondary meaning "must be determined on the basis of facts as they exist at the time when the issue of registrability is under consideration") (citation omitted); *see also Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1730 (citing this practice with approval). Accordingly, the Board will take into account facts arising after the mark was adopted and after the filing of the application, up to the closing of the testimony periods. So as to be clear, the Board can and must consider all evidence of use, promotion, consumer reaction and the like properly presented up to the close of the opposition's trial phase. *General Foods Corp. v. MGD Partners*, 224 USPQ 479, 486 (TTAB 1984). *See also Larami Corp. v. Talk To Me Programs*, 36 USPQ2d 1840, 1846 (TTAB 1995); *Harsco Corp. v. Elec. Sciences, Inc.*, 9 USPQ2d 1570, 1571 (TTAB 1988).

An applicant seeking registration of a mark under Section 2(f) bears the ultimate burden of establishing acquired distinctiveness. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988). Applicant's burden is to prove acquired distinctiveness by a preponderance of the evidence. *Id.* at 1006. "Finally, the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005).

Applicant's claim under Section 2(f) is supported by Applicant's declaration that its involved marks have acquired distinctiveness "through substantially exclusive

and continuous use in commerce for at least the five years immediately preceding the date of this statement [October 23, 2012]." Applicant also points to other facts that support its claim. Applicant began use of its marks in 2006, and since that time has sold an estimated 779 million doses of its product. Applicant's advertising expenditures of record are as follows: $15 million (Oct. 2006-Jan. 2007); $5.6 million (2009); and $1.3 million (early 2010). (52 TTABVUE 34-35; 53 TTABVUE 68).

Contrary to Opposer's argument, we do not view Applicant's burden to show acquired distinctiveness to be "a particularly heavy one." (72 TTABVUE 54). And, we certainly do not share Opposer's view that Applicant should have taken a survey to determine the public's recognition that Applicant's marks have acquired distinctiveness. (76 TTABVUE 26). *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 6 USPQ2d at 1010 (noting that "absence of consumer surveys need not preclude a finding of acquired distinctiveness").

We find, however, that in view of the degree of descriptiveness of Applicant's proposed mark, the evidence falls short of establishing acquired distinctiveness. In reaching our conclusion, we acknowledge Applicant's use dating back to 2006.[21] However, the issue is whether acquired distinctiveness of the mark in relation to the goods has in fact been established in the minds of the purchasing public, not whether the mark is capable of becoming distinctive. *In re Redken Labs., Inc.*, 170 USPQ 526, 528 (TTAB 1971). *See In re Packaging Specialists, Inc.,* 221 USPQ 917, 920 (TTAB

---

[21] The evidence of third-party usage of Mini Melts marks for food products does not negate Applicant's claim that its use has been "substantially exclusive." To this point, the record is devoid of any third-party uses of the same or a similar mark in the pharmaceutical industry.

36

1984) (use of mark for sixteen years deemed "a substantial period but not necessarily conclusive or persuasive on the Section 2(f) showing"). "To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself." *In re Steelbuilding.com,* 75 USPQ2d at 1422. *See also Coach Servs. Inc. v. Triumph Learning LLC,* 101 USPQ2d at 1729.

Applicant alleges almost $22 million in advertising expenditures. However, the expenditures declined significantly over a three-year period, and Applicant failed to furnish any numbers related to the most recent five years. Further, proof of an expensive and successful advertising campaign is not in itself enough to demonstrate acquired distinctiveness. *See In re Boston Beer Co. L.P.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999). The ultimate test in determining whether a designation has acquired distinctiveness is Applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source.

With respect to sales revenue, Applicant quantifies it in terms of 779 million doses sold. The probative value of this evidence is diminished by the fact that the amount is just a raw number in the vast pharmaceutical industry, providing no context showing Applicant's market share and whether the stated amount of doses sold is significant in the industry. *See Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1681 (TTAB 2007) (sales figures for 14 years, standing alone and without any context in the trade, found insufficient). Further, the raw number, although perhaps

showing the relative success of applicant's product, does not necessarily evidence consumers' recognition of the proposed mark as a source indicator. *See In re Boston Beer Co. L.P.*, 53 USPQ2d at 1057.

More evidence, especially in the form of direct evidence from the relevant purchasing public, than what Applicant has submitted would be necessary to show that its proposed marks have become distinctive for its goods. *In re Tennis Indus. Ass'n*, 102 USPQ2d 1671, 1682 (TTAB 2012) ("Sheer numbers alone are not necessarily enough to prove secondary meaning" where the applicant "provided insufficient detail whereby we may ascertain the impact of its expenditures on the relevant public") (citing *Boston Beer*). We conclude that the evidentiary record fails to establish that Applicant's marks have acquired distinctiveness.

**DECISION:** The notice of opposition based on likelihood of confusion is dismissed. The notice of opposition based on the failure to prove acquired distinctiveness is sustained, and registration is refused on this basis only.